**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

TERRY GRECO,

              Plaintiff,                CASE NO. 12-CV-12212
                                        HONORABLE DENISE PAGE HOOD

v.

LIVINGSTON COUNTY, a
Municipal Corporation, and
DEPUTY ANTHONY CLAYTON, in his
Individual and Official Capacities,

              Defendants.

_____/

**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY**
**JUDGMENT [DKT. # 28] AND GRANTING IN PART DEFENDANTS'**
**MOTION FOR PROTECTIVE ORDER PRECLUDING DEPOSITIONS OF**
**UNDERSHERIFF MICHAEL MURPHY AND SHERIFF BOB BEZOTTE**
**[DKT. # 27]**

**I.**      **INTRODUCTION**

      This matter involves an alleged use of excessive force by a police deputy

(acting through his trained canine). Plaintiff has brought suit against the Police

Deputy (Deputy Anthony Clayton) in an individual capacity and suit against

Livingston County as Clayton was an employee of the Livingston County Sheriff's

Department. Now before the Court is the Defendants' Motion for Summary Judgment

**[Docket No. 28, Filed July 5, 2013]** and Defendants' Motion for Protective Order

Precluding Depositions of Undersheriff Michael Murphy and Sheriff Bob Bezotte **[Docket No. 27, Filed June 27, 2013]**.

For the reasons discussed below, the Court **DENIES** Defendants' Motion for Summary Judgement. Defendants' Motion for Protective Order is **GRANTED, IN PART**.

## II.    BACKGROUND

Plaintiff, Terry Greco, filed the present action in this Court on May 21, 2012. **[Docket # 1, Pl. Compl.]** The Complaint states that on September 30, 2011, she attended a self-help conference in Howell County, Michigan. **[Compl. ¶ 5]** While at the conference, Plaintiff had consumed some wine. **[Compl. ¶ 6]** At approximately 11:15 p.m., Plaintiff left the conference and, on the way home, became lost and attempted to pull off on to the side of the road to "regain her bearings" because it was raining heavily. **[Compl. ¶ 7-9]** While attempting to exit the roadway, Plaintiff's car got stuck in the mud, which caused her to seek assistance on foot. **[Compl. ¶ 9-10]** Plaintiff decided to walk to a nearby gas station and she approached two EMS technicians to ask for help. **[Compl. ¶ 11]** One of the EMS technicians accused Plaintiff of being drunk and threatened to call the police which caused Plaintiff to panic and she decided to walk to the back of the gas station to avoid detection by the police. **[Compl. ¶ 12-13]**

2

Defendant, Deputy Anthony Clayton, a deputy with the Livingston County Sheriff's Department, was dispatched to the gas station. **[Compl. ¶ 13]** Deputy Clayton brought his police dog ("Diago") with him as well as a "ride along" observer, Mr. Curtis Stuart. **[Compl. ¶ 14]** Upon arriving at the gas station, Deputy Clayton was apprised of the direction that Plaintiff had taken and also given a physical description. **[Compl. ¶ 15]** Soon thereafter, Deputy Clayton located Plaintiff and Clayton's dog, Diago, bit Greco on her leg. **[Compl. ¶ 21-24]** Plaintiff alleges that she screamed to Clayton, "Get [Diago] off my leg!" **[Compl. ¶ 23]** Deputy Clayton responded by directing Plaintiff to "Shut up," and "Stop moving." **[Compl. ¶ 23]** Plaintiff alleges that when Diago stopped biting her, she requested that Clayton take her to the hospital and he responded, "Shut up . . . you're going to make this dog even worse . . . you keep it up, princess"; after which another deputy indicated, "You should have seen the last guy." **[Compl. ¶ 24]**

Plaintiff contends that she has "sustained numerous bite wounds and contusions on her right leg that required eight staples, surgical drainage of a hematoma which became . . . infected, . . . [and] has been left with serious permanent disfigurement on her legs as well as other physical and emotional injuries." **[Compl. ¶ 25]** Plaintiff alleges that at the time that she was approached by Deputy Clayton she was "sitting on the ground with her hands on her head" and "offer[ed] no resistance whatsoever."

3

**[Compl. ¶ 20]**  She states that despite her compliance, she was "viciously attacked" by Diago and that Clayton allowed the dog to "rip and tear" her leg and skin for over 20 seconds.  **[Compl. ¶ 21-22]**

Plaintiff's Complaint contained three claims for relief: (1) a federal law claim alleging excessive force pursuant to 42 U.S.C. § 1983 and/or the Fourth, Eighth, or Fourteenth Amendments against Deputy Clayton; (2) state law claims alleging gross negligence, willful and wanton misconduct, and assault and battery against Deputy Clayton; and (3) federal law claims alleging failure to train, inadequate policies and/or procedures, illegal customs and/or practices against Livingston County.  On April 23, 2013, the Court issued an Order and Opinion dismissing Plaintiff's claim of excessive force to the extent that it relied on the Eighth and Fourteenth Amendments, dismissing Plaintiff's gross negligence claim in its entirety because it was premised on an intentional tort, and allowing Plaintiff to proceed through discovery on her negligent training and supervision claims.

## III.   ANALYSIS

Summary judgment is appropriate in cases where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317,

322 (1986). The moving party bears the burden of demonstrating that summary judgment is appropriate. *Equal Employment Opportunity Comm'n v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1093 (6th Cir. 1974). The Court must consider the admissible evidence in the light most favorable to the nonmoving party. *Sagan v. United States of Am.*, 342 F.3d 493, 497 (6th Cir. 2003).

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added). To create a genuine issue of material fact, the nonmovant must do more than present "some evidence" of a disputed fact. Any dispute as to a material fact must be established by affidavits or other documentary evidence. Fed. R. Civ. P. 56©. "If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249-50 (citations omitted). Accordingly, a nonmovant "must produce evidence that would be sufficient to require submission to the jury of the dispute over the fact." *Mathieu v. Chun*, 828 F. Supp. 495, 497 (E.D. Mich. 1993) (citations omitted). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

5

In their Motion for Summary Judgment, Defendants make two arguments. First, Defendants argue that Deputy Clayton did not violate Plaintiff's Fourth Amendment rights because he did not engage in any intentional act that could justify liability. Second, Defendants contend that Plaintiff lacks a claim against Livingston County because the County did not act with deliberate indifference and Deputy Clayton did not violate Plaintiff's Constitutional rights.

In their Motion for Protective Order, Defendants allege that neither Sheriff Robert Bezotte nor Undersheriff Michael Murphy were personally involved in the alleged incident and, furthermore, that testimony from either would not be helpful because the "development of policies and procedures" for the County is irrelevant.

## A. Claim for Violation of the Fourth Amendment Against Deputy Clayton

The Supreme Court has held that all claims that law enforcement officers have used excessive force—"deadly or not"—in the course of an arrest, investigatory stop, or other seizure, should be analyzed under the Fourth Amendment's "objective reasonableness" test. *Graham v. Connor*, 490 U.S. 386, 395 (1989). In applying the objective reasonableness test, the court is required to pay "careful attention to the facts and circumstances of each particular case, including (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest

6

by flight." *Id.* A seizure must occur before an excessive force claim is cognizable under the Fourth Amendment. *See County of Sacramento v. Lewis*, 523 U.S. 833, 844-45 & n.7 (1998). A seizure within the meaning of the Fourth Amendment "requires an intentional acquisition of physical control," *Brower v. Inyo County*, 489 U.S. 593, 596 (1989), and "only when there is a governmental termination of freedom of movement through means intentionally applied" is the Fourth Amendment implicated. *Id.* at 597. "[T]he Fourth Amendment addresses 'misuse of power,' . . . not the accidental effects of otherwise lawful government conduct." *Id.* at 596.

In this case, Plaintiff alleges that Deputy Clayton "owed [her] the duty to act prudently and with reasonable care, and otherwise to avoid unnecessary, unreasonable and illegal use of . . . excessive force" and that Deputy Clayton breached that duty when he used the police dog against her and failed to promptly "call off the dog" when he saw that the dog was biting her. She states that Deputy Clayton's decision to continue to use the dog "despite the fact that [the dog] previously failed to comply with verbal commands during other incidents" also amounted to a breach of the duty she was owed. As a direct and proximate cause of Deputy Clayton's actions, Plaintiff contends she has suffered, among other things, physical pain, mental anguish, fright and shock, wage loss, and reasonable expenses of necessary medical care, treatment, and services.

In response, Defendants argue that Deputy Clayton did not violate Plaintiff's Fourth Amendment rights because he "made no intentional act to justify liability." First, Defendants contend that the definition of "person" as used within 42 U.S.C. § 1983 does not include police dogs.  Defendants also cite 1 U.S.C. § 1, which they state stands for the proposition that dogs were not meant to be read into those "persons" who can be found liable pursuant to § 1983 because "the context [does not] indicate[] otherwise."  1 U.S.C. § 1 (2013).  Determining that the dog could not be seen as a "person," Defendants next argue that Deputy Clayton did not violate Plaintiff's rights because he: (1) did not actively participate in the use of excessive force because he did not bite Plaintiff, did not command the dog to bite Plaintiff, and did not make an intentional act in the application of force against Plaintiff; (2) did not supervise an officer who used excessive force; and (3) did not owe Plaintiff a duty of protection against the use of excessive force because he had no reason to know that excessive force would be used and lacked the "opportunity and the means to prevent the harm from occurring."  *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997).

Additionally, Defendants contend that Deputy Clayton did not violate Plaintiff's Fourth Amendment rights because the dog bite was accidentally set in motion.  Defendants argue that when Deputy Clayton approached Plaintiff, he slipped and fell and the dog's bite was a "spontaneous reaction to . . . Clayton's slip and fall."

8

Defendants assert that because it is undisputed that Deputy Clayton did not direct or command Diago to bite the Plaintiff, Plaintiff does not have a cognizable § 1983 claim against the Deputy. Lastly, Defendants contend that a negligent act cannot be the basis upon which Plaintiff makes her excessive force claim because, on its face, a negligence claim would negate the intent element required for a seizure under the Fourth Amendment. *Brower*, 489 U.S. at 596-97 ("It is clear, in other words, that a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally desired termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement through means intentionally applied.").

As previously stated, summary judgment is appropriate in cases where "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 322. Viewing the facts in the light most favorable to the nonmoving party and determining that there are "'genuine' dispute[s] as to those facts[,]" *Scott*, 550 U.S. at 380, the Court holds that summary judgement is not appropriate at this time. Though, as Defendants note, it is

undisputed that Deputy Clayton did not verbally command the dog to bite the Plaintiff, there are many material facts surrounding the incident that are disputed. Additionally, though all parties agree that "excessive force in the course of making [a] . . . 'seizure' of [a] person . . . [is] properly analyzed under the Fourth Amendment's 'objective reasonableness' standard[,]" *Graham*, 490 U.S. at 388, there is dispute as to whether Deputy Clayton's actions were "reasonable" under the circumstances. Defendants contend that Clayton acted reasonably and that the biting occurred because of an unintentional act, his slipping and falling while approaching Plaintiff. **[Pl. Ex. C at 96-98]** However, Plaintiff contends—and the record shows—that there is a question as to whether Deputy Clayton actually slipped and fell directly preceding the dog bite. Neither Plaintiff nor witness, Curtis Stuart, Deputy Clayton's ride-along companion, testified[1] to seeing Deputy Clayton slip and fall immediately preceding the incident.[2] **[Pl. Ex. A at 60-62, Pl. Ex. B at 21-24]** This raises a question of material fact as to whether Deputy Clayton made an intentional act that initiated the

---

[1]

Note: All testimony referred to in this Order is deposition testimony.

[2]

The Court notes that Witness Stuart testified that he "did see Deputy Clayton trip a few times." However, he did not testify that Officer Clayton tripped and fell immediately preceding the bite or that a trip and fall was the reason the Dog bit Plaintiff. The Court also notes that Stuart testified that Deputy Clayton repeatedly told Plaintiff to "stop kicking the dog" and that he did not "want [her] to get bit," but that Plaintiff continued to kick in the direction of the dog. **[Pl. Ex. B at 22-23]**

10

dog bite, despite his not verbally commanding the dog to bite Plaintiff. Deputy Clayton's response to the biting also raises questions. Clayton testified that upon seeing that Diago was biting Plaintiff, he did not "immediately" command the dog to stop, but waited between "10 and 20 seconds." **[Pl. Ex. C at102]** Though Deputy Clayton agreed that Diago is trained to "grip down pretty hard," "grab on extremely hard," and "not let go until ordered to," Clayton did not immediately command the dog to release Plaintiff's leg. **[Pl. Ex. C at 103-04]** Though Deputy Clayton testified that the dog is trained to bite in this way to "detain . . . or stop [a suspect] . . . so that [he] . . . [can] make sure . . . the person can't get away and hurt [him]," there was no testimony presented that gave the indication that Deputy Clayton believed Plaintiff to be a danger to him and Plaintiff was on the ground, not posing much of a danger of escape. For these reasons, the Court determines that questions of material fact exist and summary judgement is not appropriate on this claim at this time.

## B. Claim for Willful and Wanton Misconduct and Assault and Battery Against Deputy Clayton

Plaintiff's second claim is that Deputy Clayton committed willful and wanton misconduct and assault and battery against her by allowing Diago to bite her. Further, Plaintiff contends that by "[f]ailing to promptly call off the dog" and waiting "approximately 22 seconds when such force was absolutely unnecessary[,]" Deputy Clayton violated her rights. Lastly, Plaintiff argues that Deputy Clayton's continued

11

use of Diago, despite knowing that the dog had "previously failed to comply with verbal commands during other incidents" and "would attack when unprovoked and allegedly when not ordered to attack[,]" violated her rights.

In Michigan, "to establish wilful and wanton misconduct, the plaintiff must prove that the defendant (1) had knowledge of a situation requiring the exercise of ordinary care and diligence to avert injury to another; (2) had the ability to avoid the resulting harm by ordinary care and diligence in the use of the means at hand; and (3) omitted to use such care and diligence to avert the threatened danger when, to the ordinary mind, it would be apparent that the result would likely prove disastrous to another." *Cheeseman v. Huron Clinton Metro. Auth.*, 191 Mich. App. 334, 335 (1991). Willful and wanton misconduct "is made out only if the conduct alleged shows an intent to harm or, if not that, such indifference to whether harm will result as to be the equivalent of a willingness that it does." *Gentry*, 296580, 2011 WL 4810847, at *6; *Cheeseman*, 191 Mich. App. at 334. The Court notes that it need not decide whether Deputy Clayton's actions amounted to willful and wanton misconduct. The Court must merely determine whether, in viewing the facts in the light most favorable to Plaintiff, Defendants have made a showing that no reasonable jury could believe that on Plaintiff's version of the facts, Deputy Clayton intended to cause Plaintiff harm by not ordering the dog to immediately release her or that he was

12

indifferent as to whether harm would result. Because the Court cannot make a finding that no reasonable jury could believe that Deputy Clayton's decisions to not immediately "call off the dog" and continue to use this particular dog showed indifference as to whether harm could result, summary judgment is not warranted on this claim.

Plaintiff also contends that Deputy Clayton committed assault and battery by allowing Diago to bite her and continue to bite her for "approximately 20 seconds when such force was absolutely unnecessary." "Under Michigan law an assault is an attempt to commit a battery or an unlawful act which places another in reasonable apprehension of receiving an immediate battery." *Bletz v. Gribble*, 641 F.3d 743, 757 (6th Cir. 2011). A battery is defined as "an unintentional, unconsented and harmful or offensive touching of the person of another, or of something closely connected with the person." *Id.* Viewing the facts before the court in the light most favorable to the Plaintiff, the Court cannot determine that no genuine issue of material fact exists regarding whether Defendant Deputy Clayton's actions constituted an assault or battery on Plaintiff. Therefore, summary judgement is not warranted on this claim.


**C. Claim Against Livingston County**

13

Plaintiff's last claim is that Livingston County violated the "4th, 8th, and/or 14th Amendments" because it "owed [her] certain duties to properly hire, supervise, monitor and train Clayton . . . so as to not use unnecessary, unreasonable, excessive and/or illegal force under the circumstances which existed . . . ." Defendants argue that Plaintiff's claims against the County must fail because the County did not act with deliberate indifference when hiring and supervising Deputy Clayton and because Deputy Clayton's actions did not amount to a violation of Plaintiff's Constitutional rights.

The landmark case controlling this type of suit is *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). In *Monell*, the United States Supreme Court overruled it's prior decision in *Monroe v. Pape*, 365 U.S. 167 (1961), and held that a local government is a "person" which is subject to suit under 42 U.S.C. § 1983 in civil actions for deprivation of rights. *Monell*, 436 U.S. at 694-95. A local government is not responsible under § 1983 solely because injuries were inflicted by its employees or agents. *See id.* at 694. "Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983." *Id.* A plaintiff must therefore specify a governmental policy or custom from which his injuries flowed. *See Paige v. Coyner*, 614 F.3d 273, 284 (6th Cir. 2010). Failure to provide employees with adequate training can give rise

14

to *Monell* liability when it "evinces deliberate indifference for the rights of those with whom the governmental employees have contact, such that the inadequate training may be fairly said to represent the government's policy or custom." *Brown v. Cuyahoga Cnty., Ohio*, 517 F. App'x 431, 436 (6th Cir. 2013) (citing *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989)).

In considering a municipal liability claim, the Court must first determine whether a plaintiff has set forth sufficient facts from which "the existence of a custom or policy could be inferred." *Doe v. Claiborne Cnty.*, 103 F.3d 495, 509 (6th Cir. 1996). The policy or custom must be the moving force behind the constitutional injury, and a plaintiff must identify the policy, connect the policy to the governmental entity, and show that the particular injury was caused because of the execution of that policy. *See Turner v. City of Taylor*, 412 F.3d 629, 639 (6th Cir. 2005). A "custom" for purposes of *Monell* liability

> must be so permanent and well settled as to constitute a custom or usage with the force of law. In turn, the notion of "law" must include [d]eeply embedded traditional ways of carrying out state policy. It must reflect a course of action deliberately chosen from among various alternatives. In short, a "custom" is a "legal institution" not memorialized by written law.

*Doe*, 103 F.3d at 507 (citations and quotations omitted).

15

In this case, Plaintiff has alleged that Livingston County had customs or practices that violated her constitutional rights.  In her response to Defendants' Motion for Summary Judgment, Plaintiff notes that Defendant Livingston County's "policies regarding police dogs are deficient with regard to an officer's duties relative to the handling of dogs."  Specifically, Plaintiff points to the section entitled "Utilization" and notes that though the section speaks to when a police dog should be used, it "fails to set forth an official position regarding *how* the dog should be used." Plaintiff contends that the County's failure to provide any evidence that it has taken steps to anticipate and prevent the type of injuries that she suffered, and, furthermore, its failure to comply with this Court's discovery orders in relation to their municipality liability claim by not turning over the requested identity of the other individual which Defendants admit was bitten by Diago so that they could "ascertain the circumstances surrounding the bite and whether it rises to the level of a constitutional violation," precludes the Court's granting of summary judgment.[3]

In addition to identifying a custom or practice, to make a *Monell* claim, "plaintiff must demonstrate that, through its deliberate conduct, the municipality was

---

[3] The Court also notes that Plaintiff has requested to depose both Undersheriff Michael Murphy and Sheriff Robert Bezotte to attain this information.  Defendants have moved this Court to enter an order of protection against both the Undersheriff and Sheriff, the subject of Defendants' Motion for Protective Order **[Docket No. 27]** which is discussed below.

16

the 'moving force' behind the injury alleged.  That is, . . . plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."  *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997).  In this case, Plaintiff alleges that she has suffered injury as a "direct and proximate cause" of Deputy Clayton's actions and that Livingston County—being responsible for the "training, policy, and/or procedures resulting in the use of [the dog] under the circumstances involved in this case"—was ultimately responsible.

Because the court has determined that Plaintiff has established genuine issues of material fact relating to whether Deputy Clayton violated her constitutional rights as well as to whether Livingston County had a policy or custom of not directing its officers on how to control their police dogs, and because Plaintiff has not yet had the opportunity to depose either the Sheriff or Undersheriff and ascertain additional information regarding the policies and procedures of the County in regards to police dogs (their training and officer training regarding control of the dog), the court cannot grant summary judgment based on municipality liability.  Defendants' Motion for Summary Judgment  **[Docket No. 28, Filed July 5, 2013]** is **DENIED**.

## D.  Motion for Protective Order

17

Defendants move this court to enter a protective order to preclude the depositions of Sheriff Robert Bezotte and Undersheriff Michael Murphy.  **[Docket No. 27, filed June 27, 2013]**  Defendants contend that this Court should grant their motion because neither Sheriff Bezotte nor Undersheriff Murphy were personally involved in the alleged incident and because the development of policies and procedures in the County is irrelevant.

In general, the scope of discovery is broad. "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . .  Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."  Fed. R. Civ. P. 26(b).  Under Federal Rule of Civil Procedure 26©, a district court "may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," thereby limiting discovery.  Courts have interpreted Rule 26© to impose limits on when a high-ranking government official may be subject to deposition.  *See Boudreau v. Bouchard*, 07-10529, 2008 WL 4386836, at *2 (E.D. Mich. Sept. 25, 2008), *opinion amended on reconsideration*, 07-10529, 2009 WL 55912 (E.D. Mich. Jan. 8, 2009) ("This rule is based on the notion that 'high ranking government officials have greater duties and time constraints than other witnesses' and that, without appropriate limitations, such officials will

18

spend an inordinate amount of time tending to pending litigation.") (citation omitted). Because a high ranking official has both substantial demands on his time and a duty to serve the public, such an official should be subject to deposition only after: (1) a litigant seeking his deposition has exhausted other sources that might yield the information sought, and (2) a showing by the litigant that the official has "first-hand knowledge related to the claim being litigated."   *See id.*   Without such a rule, high-ranking officials would be constantly subject to the demands of pending litigation, inhibiting their ability to execute their official duties.   In *Monell* claims, it is the court's task "to identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." *McMillian v. Monroe Cnty., Ala.*, 520 U.S. 781, 785 (1997) (citation omitted).

In this case, it appears that the Sheriff and Undersheriff would be the most knowledgeable regarding policymaking in the County.   However, Defendants assert that though the Sheriff and Undersheriff "are the highest ranking officials at the Livingston County Sheriffs Department," they "lack personal knowledge of the events in this lawsuit" and there are "other means of discovery that could provide Plaintiff with any possible discoverable information that these individuals could provide." Defendants have failed to provide the names of these "other individuals," both at the

hearing the Court held on September 11, 2013, and prior to that hearing. The court is also not aware of any representation made by Defendants following the hearing that would give the court or Plaintiff notice of the identity of any person other than the Sheriff or Undersheriff that would be more knowledgeable regarding the policymaking.

The Court is also not persuaded by Defendants' argument that the "development of any policies or procedures is irrelevant to whether Plaintiff has a valid claim under *Monell*." Plaintiff attempts to make a showing that there was a policy in place, the County was aware of this policy, and the policy was the direct cause of her injury and violation of her constitutional rights. MRE 401 provides: "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Information regarding the development of the policy, whether the County had reason to believe, based on previous occurrences, that the policy at the time was insufficient, is relevant to Plaintiff's claim.

The Court appreciates the " substantial demands on . . . time and [the] duty to serve the public" for both Sheriff Bezotte and Undersheriff Murphy. For this reason,

the Court requires that Defendants produce either Sheriff Bezotte or Undersheriff Murphy for deposition.

## IV.  CONCLUSION

For the reasons set forth above,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment **[Docket No. 28, Filed July 5, 2013]** is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Protective Order Precluding Depositions of Undersheriff Michael Murphy and Sheriff Bob Bezotte **[Docket No. 27, June 27, 2013]** is **GRANTED, IN PART**.

**IT IS FURTHER ORDERED** that Defendants must produce either Sheriff Bezotte or Undersheriff Murphy for Deposition within 21 days of entry of this Order.

**IT IS SO ORDERED**.


S/Denise Page Hood
Denise Page Hood
United States District Judge

Dated:  January 31, 2014

I hereby certify that a copy of the foregoing document was served upon counsel of record on January 31, 2014, by electronic and/or ordinary mail.

S/LaShawn R. Saulsberry

Case Manager